IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

Timothy Ledford,    )
          )  Civil Action No.  6:14-1164-BHH-KFM
     Plaintiff, )
          )  **REPORT OF MAGISTRATE JUDGE**
  vs.      )
          )
Carolyn W. Colvin, Acting )
Commissioner of Social Security, )
          )
     Defendant. )
_____)

   This case is before the court for a report and recommendation pursuant to

Local Civ. Rule 73.02(B)(2)(a)(D.S.C.), concerning the disposition of Social Security cases

in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

   The plaintiff brought this action pursuant to Sections 205(g) and 1631(c)(3)

of the Social Security Act, as amended (42 U.S.C. 405(g) and 1383(c)(3)), to obtain judicial

review of a final decision of the Commissioner of Social Security denying his claims for

disability insurance benefits and supplemental security income benefits under Titles II and

XVI of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

   The plaintiff filed applications for disability insurance benefits ("DIB") and

supplemental security income ("SSI") benefits on July 30, 2012, alleging that he became

unable to work on December 1, 2011.  The applications were denied initially and on

reconsideration by the Social Security Administration.  On May 9, 2013, the plaintiff

requested a hearing.  The administrative law judge ("ALJ"), before whom the plaintiff and

Clarence Hulett, an impartial vocational expert, appeared via video hearing on August 7,

---

[1]A report and recommendation is being filed in this case, in which one or both parties declined
to consent to disposition by the magistrate judge.

2013, considered the case *de novo*, and on September 12, 2013, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended. The ALJ's finding became the final decision of the Commissioner of Social Security when the Appeals Council denied the plaintiff's request for review on January 30, 2014. The plaintiff then filed this action for judicial review.

In making the determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

(1)    The claimant meets the insured status requirements of the Social Security Act through December 31, 2017.

(2)    The claimant has not engaged in substantial gainful activity since December 1, 2011, the alleged onset date (20 C.F.R §§ 404.1571 *et seq.*, and 416.971 *et seq.*).

(3)    The claimant has the following severe impairment: mild to moderate lumbar degenerative disc disease (DDD) with only slight nerve contact and mild to moderate stenosis (20 C.F.R. §§ 404.1520(c) and 416.920(c)).

(4)    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 416.920(d), 416.925 and 416.926).

(5)    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a wide range of light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b) with the ability to occasionally lift and/or carry up to 20 pounds as defined in the Dictionary of Occupational Titles (D.O.T.) and regulations, as well as, lift/carry 10 pounds frequently. This includes sedentary work as defined in the D.O.T. and regulations. He has no limits for sitting in an eight-hour workday. He is capable of standing and/or walking for up to six hours in an eight-hour workday. In the course of work, he should be allowed the ability to optionally alternate between sitting and standing, but such would not cause him to be off-task. He is capable of occasionally climbing ramps/stairs, crouching and stooping. He is to perform no crawling, no kneeling and no climbing of ladders/ropes/scaffolds. In the course of work, he is to perform no overhead lifting, no overhead reaching and no overhead

2

carrying w/ the left non-dominant upper extremity. Secondary ot alleged pain and mild anxiety/depression, he retains the capacity to understand, remember and carry-out at least simple instructions and perform simple routine tasks as consistent with unskilled work. He is to be subject to no mandated production quotas such as producing X product in X amount of time. The claimant is able to perform sustained work activity on a regular and continuous basis for eight hours per day, forty hours per week.

(6)     The claimant is unable to perform any past relevant work (20 C.F.R. §§ 404.1565 and 416.965).

(7)     The claimant was born on April 13, 1970, and was 41 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 C.F.R. §§ 404.1563 and 416.963).

(8)     The claimant has a limited education and is able to communicate in English (20 C.F.R. §§ 404.1564 and 416.964).

(9)     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

(10)    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. §§ 404.1569, 404.1569(a), 416.969 and 416.969(a)).

(11)    The claimant has not been under a disability, as defined in the Social Security Act, from December 1, 2011, through the date of this decision (20 C.F.R. §§ 404.1520(g) and 416.920(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

3

## **APPLICABLE LAW**

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment. 20 C.F.R. §§ 404.1520, 416.920. If an individual is found not disabled at any step, further inquiry is unnecessary. *Id.* §§ 404.1520(a)(4), 416.920(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62, 1982 WL 31386, at *3. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

4

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that the conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## EVIDENCE PRESENTED

On March 23, 2011, Michael J. Bernardo, M.D., provided a note indicating that he was treating the plaintiff for severe bilateral plantar fasciitis, chronic low back pain, and peripheral neuropathy of the lower extremities resulting from a "severe fall from a ladder several years ago." Dr. Bernardo indicated that the plaintiff had recently been diagnosed with an autoimmune disorder with Sjogren's type antibodies and had an appointment scheduled with a rheumatologist for further evaluation (Tr. 370).

On April 19, 2011, Bruce E. Goeckeritz, M.D., of Lexington Rheumatology, initially evaluated the plaintiff at Dr. Bernardo's request for diffuse musculoskeletal complaints and an elevated ANA with SS-A specificity. Dr. Goeckeritz indicated that the plaintiff reported "a number of symptoms involving his muscles and joints, especially in his legs." The plaintiff reported feeling like he had been on his legs for hours and not feeling much better when he took time off his legs. Dr. Goeckeritz indicated that the plaintiff also had some shortness of breath, and the plaintiff was convinced this was related to Sjogren's syndrome. The plaintiff's medications included Lortab, Lyric, Pepcid, Xanax, Hyoscyamine, Prednisone, and Restatis eye drops. The plaintiff rated his pain at 7 to 8 out of 10. He had "a little bit of tremor" in his hands and normal ranges of motion throughout. The plaintiff's left ankle had significant puffiness over the lateral malleolus. Dr. Goeckeritz indicated that the plaintiff's wheezing could be related to tobacco use and recommended that he see his primary care doctor if his wheezing persisted. Dr. Goeckeritz ordered blood work and indicated that the plaintiff had a "potpourri of symptoms related to the muscles and the joints without any obvious evidence for synovial swelling today and associated with some dryness in the eyes and mouth." Dr. Goeckeritz noted that the plaintiff had a strong family history of chronic pain disorders and that the plaintiff had a marginal response to prednisone and pain medication. He added Albuterol and Plaquenil to the plaintiff's

medications.  Dr. Goeckeritz also tapered the plaintiff's steroids in order to "see his joints and check his seriologies off all immunosuppression" (Tr. 330-32).

On May 3, 2011, the plaintiff reported having more difficulty getting up and going to work since reducing his prednisone.  The plaintiff also complained that Lortab 10 was no longer sufficient in reducing his pain.  Dr. Goeckeritz reviewed the plaintiff's blood work and indicated that the plaintiff had no objective evidence of muscle disease, joint disease, or autoimmune disease apart from a "mild elevation in CK and aldolase."  Dr. Goeckeritz indicated that he was going to taper the plaintiff off of steroids completely to "take all possibly confounding variables away and then reexamine" the plaintiff. Dr. Goeckeritz continued the plaintoff on Lortab and Plaquenil and gave him samples of Cymbalta. Dr. Goeckeritz also indicated that he could not explain the conflicting laboratory results (Tr. 328-29).

On June 8, 2011, Dr. Bernardo evaluated the plaintiff for anxiety, gastroesophageal reflux disease ("GERD"), and low back pain.  Dr. Bernardo continued the plaintiff's medications for GERD, generalized anxiety disorder, and fibromyalgia (Tr. 309-11). On June 16, 2011, Dr. Goeckeritz reevaluated the plaintiff.  He noted that the plaintiff had been in the hospital and that there had been some confusion with his medication refills. Dr. Goeckeritz diagnosed myalgias and muscle fatigue of unclear etiology.  He ordered repeat blood work, restarted the plaintiff on Plaquenil, and referred him for a neurology consult and testing (Tr. 326-27).

On August 5, 2011, Dr. Bernardo evaluated the plaintiff for foot pain and follow-up of anxiety, GERD, and low back pain.  The plaintiff also reported foot swelling, foot numbness, limited weight bearing, limb weakness, and difficulty walking.  The plaintiff reported feeling poorly, feeling tired, and gaining weight.  He had tenderness in both heals and was given plantar fascia injections.  Dr. Bernardo diagnosed plantar fasciitis,

7

fibromyalgia, irritable bowel syndrome, and generalized anxiety disorder. Dr. Bernardo reviewed and renewed the plaintiff's medications (Tr. 371-74).

On October 17, 2011, Dr. Bernardo evaluated the plaintiff for bilateral foot pain and administered plantar fascia injections. Dr. Bernardo prescribed hyrocodone-acetaminophen and OxyContin for the plaintiff's low back pain, peripheral neuropathy, and bilateral plantar fasciitis (Tr. 375-77).

On November 2, 2011, Laura Odom, N.P., evaluated the plaintiff for pain in his feet. The plaintiff reported that his pain was worsened with weight bearing, walking, and standing. He reported having swelling and tenderness on the top of his right foot. The plaintiff indicated that his occasional stomach pains from an ulcer and irritable bowel syndrome ("IBS") were "no worse than normal." Dr. Bernardo continued the plaintiff's medications, including Fentanyl patches, Lyrica, hydrocodone, and Lortab (Tr. 378-81).

On November 23, 2011, the plaintiff saw Dr. Bernardo complaining of bilateral foot pain (Tr. 382-84). He indicated that Kadian "helped some." He reported having problems with his thighs being numb and tingling. The plaintiff had tenderness to palpation of his plantar fascia insertion bilaterally and mild swelling. Dr. Bernardo documented that the plaintiff had normal gait, station, and stability; he had normal muscle tone and strength; he had full range of motion in his feet and toes; and he had intact sensation (Tr. 380, 384, 387). The plaintiff denied tenderness of his spine (Tr. 380, 387). Dr. Bernardo diagnosed plantar fasciitis and prescribed narcotic pain relievers, from which the plaintiff reported relief (Tr. 382, 385).

On December 19, 2011, the plaintiff was evaluated for generalized anxiety disorder, fibromyalgia, GERD, and IBS. He reported continued foot pain that was better with Kadian. Dr. Bernardo noted bilateral heel pain and refilled the plaintiff's medications (Tr. 385-89)

8

On January 23, 2012, the plaintiff reported increased pain with walking, weight bearing, and direct pressure. He was limping and had bilateral foot pain with plantar fascia insertion. Dr. Bernardo gave the plaintiff cortisone injections in his feet for further pain management (Tr. 390-93).

On February 20, 2012, David A. Scott, M.D., of Moore Orthopaedics evaluated the plaintiff for long-standing plantar fasciitis. In addition to pain, the plaintiff reported a burning and searing pain in his feet and lower legs as well as intermittent ankle weakness. Dr. Scott noted "a little tenderness" at the plantar insertions of the plaintiff's feet bilaterally, but no signs of edema, erythema, or effusion in either foot. The plaintiff was able to flex/dorsiflex and invert/evert his feet without difficulty. He also had good muscle strength and intact sensation in his lower extremities (Tr. 512, 519). The plaintiff's straight leg raising tests were negative bilaterally (Tr. 519). Dr. Scott sent the plaintiff for an EMG, which showed no significant evidence of neuropathy or lumbar radiculopathy affecting his lower extremities (Tr. 516-17). Dr. Scott requested that his colleague W. Brett Smith, D.O., perform a consultation (Tr. 512).

On March 6, 2012, John Clavet M.D., of Moore Orthopaedics, evaluated the plaintiff and performed nerve conduction studies, which did not show significant evidence of focal entrapment neuropathy, active lumbar radiculopathy, or generalized peripheral neuropathy (Tr. 516-18, 528-32).

On March 15, 2012, Dr. Scott reevaluated the plaintiff and reviewed Dr. Clavet's findings. Dr. Scott recommended an opinion from his colleague Dr. Van Dam regarding a possible biopsy for small fiber neuropathy before proceeding with treatment (Tr. 514-15). On March 22, 2012, the plaintiff had a lumbar MRI which showed degenerative disc disease of the lumbar spine from L3-L4 through L5-S1 resulting in mild to moderate central canal stenosis. Foraminal stenosis appeared most pronounced at L5-S1 where there was slight contact with both exiting L5 nerve roots (Tr. 526-27). On March 26, 2012,

9

Dr. Scott evaluated the plaintiff for continued moderate to severe pain in his feet. The plaintiff reported that his pain was relatively constant and worsened with weight-bearing. The plaintiff had 4/5 strength in both feet and good range of motion. He had "impressive" tenderness to palpation with deep pressure over the plantar fascia insertions in both feet. Dr. Scott indicated that MRI results showed a bulging disc at L5-S1 that did contact the nerve root, but contact was not thought to be impressive enough to cause his heel pain. Dr. Scott ordered an MRI of the plaintiff's feet and recommended follow-up with Dr. Smith for consideration of surgery (Tr. 512-13).

On April 2, 2012, Dr. Bernardo evaluated the plaintiff for bilateral heel pain. the plaintiff reported increased pain with walking, weight bearing, and direct pressure as well as paresthesias. Dr. Bernardo noted that the plaintiff was scheduled to have an MRI of his feet later that week. He also noted that the plaintiff was "a bit anxious, somewhat flattened affect." Dr. Bernardo gave the plaintiff bilateral cortisone injections in his feet and continued his medications, including Lortab, Lyrica, Flexeril, and Elavil (Tr. 394-98). The plaintiff had the MRIs on feet on April 3, 2012, which confirmed plantar fasciitis (Tr. 524-26).

On April 5, 2012, Dr. Smith evaluated the plaintiff (Tr. 510). The plaintiff reported that he had plantar fasciitis for approximately four years and had received several cortisone injections, from which he received about two to three months of pain relief with diminishing effectiveness (Tr. 510). Upon examination, Dr. Smith found no evidence of atrophy or swelling of the plaintiff's lower extremities; he displayed an antalgic gait; he had intact sensation and pulses in his lower extremities; his plantar fascia were tender, but was non-tender over the Achilles and tarsal metatarsal joint; and he exhibited intact range of motion (Tr. 510). Dr. Smith reviewed MRIs of the plaintiff's feet, which showed thickening of the medial band of the plantar fascia with some reactive edema that supported the diagnosis of bilateral plantar fasciitis (Tr. 510-11). Dr. Smith had a lengthy discussion with

10

the plaintiff concerning his treatment for plantar fasciitis. Dr. Smith advised the plaintiff that he needed to use a stretching protocol for his heel cords, which the plaintiff admitted he was not doing. Dr. Smith explained that without proper stretching other treatment modalities (including injections) were bound to fail. Further, Dr. Smith informed the plaintiff that he wanted him to exhaust all conservative treatment options before considering surgical options. Dr. Smith advised the plaintiff to try stretching and orthotics for the next several months and then return for a follow-up (Tr. 511).

On May 21, 2012, Dr. Bernardo reevaluated the plaintiff. He noted that the plaintiff continued to have bilateral heel pain and the plantar fascia insertion, which was possibly more tender. Dr. Bernardo prescribed morphine sulfate for the plaintiff's lower back pain and peripheral neuropathy (Tr. 401-02).

On June 19, 2012, Ms. Odom evaluated the plaintiff for complaints of abdominal pain and constipation. The plaintiff reported having "really bad sharp pains, sets me down for a few minutes." He also reported feeling weak, having neck stiffness, and having headaches. He reported a history of IBS, but had not seen a gastroenterologist or had a colonoscopy (Tr. 403-08). The plaintiff had mild to moderate diffuse tenderness of his abdomen and normal bowel sounds (Tr. 406).

On July 26, 2012, Dr. Bernardo ordered a CT scan, which was non-specific and showed no significant abnormalities (Tr. 408-09, 441). Dr. Bernardo suspected that the plaintiff's symptoms were likely gastrointestinal-related and recommended that the plaintiff increase his fluid and fiber intake (Tr. 413). The plaintiff also reported that he had pulled his back while lifting a 60 pound bag of dog food (Tr. 409). Dr. Bernardo noted that the plaintiff reported "subjective" tenderness to palpation of his lumbar spine . The plaintiff had normal gait, station, and stability; intact muscle strength and tone; and normal range of motion (Tr. 412). Dr. Bernardo was concerned that the plaintiff was over-using pain medications. He recommended physical therapy (Tr. 413).

11

At a follow-up on August 3, 2012, Dr. Bernardo noted that the plaintiff had not been to physical therapy because he had not heard anything about the referral to physical therapy (Tr. 414). Ms. Odom evaluated the plaintiff for continued abdominal pain, constipation, nausea, and occasional vomiting. The plaintiff also had a low grade fever and complained of continued back pain. The plaintiff's medications were continued, and he was referred to a gastroenterologist for evaluation (Tr. 414-18).

On September 6, 2012, the plaintiff visited Dr. Bernardo for follow up of polyarthralgias and bilateral foot pain. He requested injections in his feet and to be treated for Sjogren's syndrome (an autoimmune disorder involving dry eyes and mouth) (Tr. 419). Dr. Bernardo informed the plaintiff that he would no longer fill his prescription for Lortab, and he would be weaned off of Kadian (Tr. 422). Dr. Bernardo started the plaintiff on a Prednisone taper. The plaintiff reported continued hand swelling, dry eyes, GERD/IBS, and generalized polyarthralgias (Tr. 422-23). Dr. Bernardo noted that the plaintiff planned to proceed with plantar fasciitis surgery in November (Tr. 419-22). On September 13, 2012, Dr. Smith reevaluated the plaintiff and scheduled a partial plantar fasciitis release of his left foot. He told the plaintiff that he would give him an injection in his right foot at the time of surgery (Tr. 508).

On September 20, 2012, the plaintiff visited the Newberry County Memorial Hospital Emergency Room for an acute left shoulder injury. The plaintiff gave inconsistent statements concerning the cause of his injury. Specifically, he told his triage nurse that he tripped and fell while walking and landed on his back (Tr. 357); he told the treating nurse practitioner that he awkwardly jerked his arm to catch his motorcycle from falling over (Tr. 355); he told his physical therapist that he was lifting boxes (Tr. 535); and he told his treating orthopaedist that he fell while on his motorcycle (Tr. 506). Treating staff noted that the plaintiff had moderate tenderness in his proximal humerus and limited range of motion in his left upper extremity, but no motor or sensory deficits, no erythema or deformity, and

12

his extremities were otherwise normal.  X-rays and a CT scan showed a humeral head fracture of the proximal left humerus.  He was advised to use ice and wear a sling.  He was given instructions not to lift greater than five pounds until released and was told not to work the following day.  The plaintiff's lumbar spine was non-tender, and he had full range of motion.  The plaintiff was discharged in "good and stable" condition and prescribed narcotic pain relievers (Tr. 355-61, 364-65).

On September 24, 2012, Dr. Bernardo evaluated the plaintiff for bilateral foot pain and left shoulder pain.  Dr. Bernardo noted that the plaintiff had been seen in the emergency room and was prescribed Lortab but did not appear to get those prescriptions filled.  Dr. Bernardo also noted that the plaintiff was being treated by a dermatologist for skin problems.  The plaintiff walked with a limp and had tenderness to palpation in his bilateral plantar fascia insertion.  Dr. Bernardo gave the plaintiff bilateral plantar fascia injections, prescribed morphine sulfate, and referred the plaintiff for an orthopaedic consultation (Tr. 423-26).

On September 25, 2012, the plaintiff followed-up with Frank Noojin, M.D., of Moore Orthopaedics, reporting that he worked as a painter.  X-rays showed non-displaced left tuberosity fracture.  Dr. Noojin documented that the plaintiff had limited ROM of his left shoulder, but his shoulder was not dislocated, and he was able to flex and extend his shoulder (Tr. 506).  Dr. Noojin placed the plaintiff on modified work duty and prescribed physical therapy and narcotic pain relievers (Tr. 506).  On October 23, 2012, the plaintiff's left shoulder was "doing really great" and healing satisfactorily.  The plaintiff had full range of motion of his left shoulder, including the ability to raise his arm above his head (Tr. 505).

On October 31, 2012, Dr. Bernardo completed a questionnaire concerning the plaintiff's mental impairment.  Dr. Bernardo indicated that the plaintiff was diagnosed with an anxiety disorder for which he was prescribed Alprazolam that helped his condition.  Dr. Bernardo further indicated that he did not feel or recommend that the plaintiff receive

psychiatric treatment for his condition.  The plaintiff was oriented to time, place, person, and situation; he had intact thought processes and content; and both his ability to concentrate/maintain attention and memory were adequate.  Accordingly, Dr. Bernardo opined that the plaintiff's mental condition would impose only "slight" work-related limitations (Tr. 501).

On November 2, 2012, the plaintiff underwent a partial plantar fascia release of his left foot (Tr. 521-22).  At his post-operative appointment, Dr. Smith found that the plaintiff was "doing well" (Tr. 504).

On November 12, 2012, Dr. Bernardo evaluated the plaintiff for abdominal pain, feet pain, and shoulder pain.  Dr. Bernardo gave the plaintiff plantar fascia injections and reviewed and adjusted his medications (Tr. 603-06).  Dr. Bernardo also informed the plaintiff that he would no longer prescribe the plaintiff narcotic pain relievers as a result of his opioid dependence (Tr. 606).  Specifically, the plaintiff was over-using medication, requesting refills early, being uncooperative with office staff and the pharmacy, and displaying dishonesty in his disclosure of pain prescriptions to other treating providers (Tr. 605).

On November 15, 2012, Dr. Smith re-evaluated the plaintiff for post-operative follow-up of his left plantar fascia release.  Dr. Smith removed the plaintiff's sutures and placed him in a high tide boot.  Dr. Smith indicated that the plaintiff could do gentle, protected weight-bearing in his boot and gentle range of motion, but no long distance walking.  Dr. Smith noted that the plaintiff would likely need orthotics down the road and refilled his pain medication (Tr. 504).

On November 26, 2012, Dr. Noojin evaluated the plaintiff for left shoulder pain.  He noted that the plaintiff was "doing well."  The plaintiff had full range of motion in both shoulders, rotator cuff strength of 4+/5 on the left, and some pain and impingement signs. X-rays showed the plaintiff's greater tuberosity fracture was still not healed but there

was some callous formation. Dr. Noojin stated he was pleased with the plaintiff's progress and continued his home exercise program (Tr. 557).

On December 5, 2012, the plaintiff saw Dr. Noojin reporting increased pain in his left shoulder. Dr. Noojin noted that although the plaintiff had decreased internal rotation, he was able to forward flex 150 degrees and had full (five out of five) motor strength. Dr. Noojin offered to perform an injection, which the plaintiff declined (Tr. 556).

On December 6, 2012, Dr. Smith documented that the plaintiff's left foot was "doing well" and recommended that the plaintiff stop use of the boot and wear an athletic shoe with an (over-the-counter) orthotic. Dr. Smith prescribed anti-inflammatory medications as well as a "small" amount of narcotic pain medication (Tr. 561). Dr. Smith subsequently discharged the plaintiff from his care (letter dated February 20, 2013) (Tr. 313). On December 7, 2012, the plaintiff returned to Dr. Noojin for left should pain and was given a steroid injection. He was given a refill/increase of his pain medication (Tr. 555).

On January 2, 2013, the plaintiff sought treatment for severe left shoulder pain and limited function from Craig Burnworth, M.D., a colleague of Dr. Noojin at Moore Orthopaedics. The plaintiff reported that he could not take Mobic because a history of a stomach ulcer and explained that he had been prescribed narcotic pain medications before for his condition. Dr. Burnworth noted that the plaintiff had fair range of motion and fair motor strength with the exception of some "slight weakness" with external rotation against resistance. Dr. Burnworth declined to prescribe him any narcotic pain medication, recommended physical therapy, and informed the plaintiff that he was only to follow-up with Dr. Noojin for his left shoulder (Tr. 554, 582).

On January 11, 2013, Dr. Bernardo evaluated the plaintiff for a follow-up of abdominal pain. The plaintiff complained of nausea and sharp, crampy pain made worse by eating. Dr. Bernardo continued the plaintiff's medications (Tr. 669-72).

On January 16, 2013, the plaintiff returned to Dr. Noojin, who opined that his fracture was healed. Dr. Noojin found that the plaintiff had full muscle strength, intact sensation, normal range of motion, and was able to fully flex and extend his fingers. Dr. Noojin ordered an MRI of the plaintiff's left shoulder (Tr. 553). The MRI showed possible "slight" subluxation, but intact biceps, healing tuberosity fracture, and no rotator cuff tears. Upon examination on January 31, 2013, the plaintiff had near full range of motion in his shoulders bilaterally; he had near full (four plus out of five) motor strength in his left upper extremity and full motor strength in his right upper extremity; and "a little bit" of tenderness to palpation of his anterior biceps. Dr. Noojin recommended continued use of home exercise therapy (Tr. 552).

On January 21, 2013, Dr. Bernardo evaluated the plaintiff. Dr. Bernardo noted that the plaintiff had an appointment with pain management in a couple of days. The plaintiff complained of burning pain in his feet. He indicated no improvement in symptoms after not working for several months. Dr. Bernardo gave the plaintiff plantar fascia injections and refilled his pain and IBS medications (Tr. 683-86).

On January 23, 2013, the plaintiff had an MRI of his left shoulder, which showed an oblique nondisplaced avulsion fracture of the greater tuberosity with a moderate to large amount of adjacent bone marrow edema. It was noted that this was a chronic fracture since it was present on plain films on November 26, 2012. The MRI also showed a 360 degree chronic degenerative type appearing labral tear without any definite paralabral cyst; mild to moderate sub-acromial, subdeltoid bursitis; and a small amount of fluid signal seen on the gleno-humeral joint most consistent with joint effusion and/or a small amount of synovitis (Tr. 579-80).

On January 29, 2013, the plaintiff initiated pain management care with Sybil Reddick, M.D., of Pain Management Associates, for pain in his feet and back. The plaintiff reported that he worked part-time as a self-employed painter and that his symptoms began

16

six years prior after falling from a ladder and had not significantly changed.  The plaintiff rated his pain at nine out of ten and indicated that it was constant.  Dr. Reddick noted that the plaintiff had a history of Sjogren's disease.  The plaintiff's review of symptoms included headaches, increased thirst, decreased sex drive, abdominal pain, heartburn, stomach ulcer, low back pain, joint pain, numbness and tingling, trouble walking, and anxiety (Tr. 618-20).  Upon examination, Dr. Reddick found that the plaintiff did not appear to be in any acute pain, and his mobility and range of motion were within normal limits.  She noted that he had a debilitated body habitus, appeared older than his stated age, and smelled of smoke.  Further, the plaintiff had mild tenderness in his feet, mild edema in his left foot, and normal muscle tone and full muscle strength in his lower extremities.  Dr. Reddick also documented that the plaintiff reported tenderness in his lumbar spine to palpation and had a positive straight leg raise test on his left, but not right, side (Tr. 619).  The plaintiff reported that he benefitted from narcotic pain relievers in the past.  Dr. Reddick performed a urine drug screen and told the plaintiff to return in two weeks to discuss pain management medication (Tr. 620).

On January 31, 2013, Dr. Bernardo evaluated the plaintiff for constant, moderate bilateral foot pain.  Dr. Bernardo gave the plaintiff bilateral plantar fascia injections and prescribed Lyrica and Cymbalta (Tr. 665-68).  That same day, Dr. Noojin evaluated the plaintiff for continued left shoulder pain.  He noted that the plaintiff's rotator cuff strength was 4+/5 on the left compared to 5/5 on the right. the plaintiff was also tender in his anterior biceps to palpation.  Dr. Noojin diagnosed healing proximal humerus fracture of the left shoulder (Tr. 552).

On February 7, 2013, Siva K. Chockalingam, M.D., evaluated the plaintiff for abdominal pain and constipation.  The plaintiff reported having two to three bowel movements per day.  The plaintiff specifically denied any muscle pain and denied any fatigue.  Upon examination, Dr. Chocklingam noted that the plaintiff appeared to be in no

distress; his abdomen was non-distended and non-tender; and he had normal bowel sounds. Dr. Chocklingam diagnosed esophageal reflux and unspecified constipation and recommended a colonoscopy (Tr. 639-42)

On February 11, 2013, Dr. Bernardo wrote a letter "To Whom It May Concern" opining that he felt "[the plaintiff] is not employable at this time" referencing the plaintiff's plantar fasciitis, Sjogren's syndrome, esophageal reflux and IBS, anxiety, and low back pain (Tr. 663).

On February 12, 2013, the plaintiff returned to Dr. Reddick. She explained her office's narcotic policy to the plaintiff and had him sign it. Examination findings were unchanged (Tr. 629-30). Dr. Reddick prescribed narcotics (Tr. 628-30). On February 20, 2013, Dr. Smith wrote a brief letter confirming that he was unable to offer the plaintiff further treatment and referred him to pain management (Tr. 313).

On February 25, 2013, the plaintiff returned to Dr. Bernardo for a follow-up for his plantar fasciitis and back pain. The plaintiff also had ringing in his ears (Tr. 659-63). Dr. Bernardo noted that the plaintiff appeared to be in no acute distress; he reported tenderness in his feet, but had no swelling, ecchymosis, or deformity; his gait and station were normal; and he had normal range of motion and muscle tone and strength (Tr. 661). Dr. Bernardo noted that although the plaintiff "was to get surgery on [his] other foot, [he] is holding off at this time" (Tr. 662).

On March 12, 2013, Dr. Reddick evaluated the plaintiff for bilateral lower extremity neuropathy and chronic back pain. The plaintiff reported that his medications were helping his pain decreasing his pain from a nine out of ten to a five or six out of ten. The plaintiff indicated that he had trouble obtaining Kadian. Dr. Reddick cautioned the plaintiff that tobacco use could worsen his pain. She refilled the plaintiff's Lortab and Kadian (Tr. 593-95).

18

On March 7, 2013, Dr. Chockalingam reevaluated the plaintiff for constipation, mild heartburn, reflux, bloating, and stomach fullness.  Dr. Chockalingam ordered diagnostic testing (Tr. 639-40).  On March 8, 2013, the plaintiff had a colonscopy which showed internal hemorrhoids and a colon polyp (Tr. 637-38).  On March 22, 2013, the plaintiff had a esophagogastroduodenoscopy with biopsy, which showed bile gastropathy and duodenitis (Tr. 634-36).

On March 12, 2013, Dr. Reddick evaluated the plaintiff who reported that his medications were helping his pain.  Dr. Reddick noted generalized tenderness in the plaintiff's lumbar spine and bilateral feet and ankles.  She refilled the plaintiff's pain medications (Tr. 801-03).

On March 18, 2013, Dr. Bernardo evaluated the plaintiff for follow-up of his feet and low back pain. The plaintiff complained of having brain fog and felt it was due to Sjogren's syndrome or fibromyalgia.  He had tender bilateral soles and slowed finger to noise movement bilaterally.  Dr. Bernardo stated that the plaintiff did not seem to grasp what he was being told about his diagnoses.  Dr. Bernardo felt that the plaintiff's brain fog could be related to six of the medications that he was taking that could affect mentation: Kadian, Lortab, alprazolam, Lyrica, Cymbalta, and Flexeril (Tr. 655-58).

On April 1, 2013, the plaintiff returned to Dr. Noojin reporting that his left shoulder was "doing pretty well" until he recently fell landing on his arm, re-aggravating his shoulder injury.  Upon examination, Dr. Noojin found that the plaintiff had full motor strength and near full internal and exertional rotation, but reported pain.  X-rays showed no acute injuries and "a little bit of calcific tendonitis" but healing fracture.  Dr. Noojin diagnosed healing greater tuberosity fracture and rotator cuff strain status post fall.  He gave the plaintiff a steroid injection and noted that the plaintiff had an appointment for pain management(Tr. 551).

19

On April 8, 2013, the plaintiff had an eye examination for complaints of two months of blurry vision. It was noted that the plaintiff had Sjogren's syndrome. He was diagnosed with dry eyes and tear film insufficiency (Tr. 584-86).

On April 9, 2013, Leslie Burke, Ph.D., reviewed the evidence concerning the plaintiff's alleged mental impairment. She determined that the plaintiff's mental impairment was not severe because it imposed no limitations in his activities of daily living and social functioning and only mild limitations in his ability to maintain concentration, persistence, and pace (Tr. 150-51).

On April 10, 2013, Dr. Reddick evaluated the plaintiff for continued chronic pain. The plaintiff reported increased low back pain since his prior visit and indicated that his pain medications were not working as well as they had before. The plaintiff also reported not being able to perform any activity due to his pain. He indicated that he wanted to try injections. The plaintiff had mild generalized edema of his left foot and mild generalized bilateral foot and ankle tenderness. Left straight leg raise was positive for leg pain, and lumbar facet provocation maneuvers were positive on the right. The plaintiff also had generalized tenderness to palpation throughout his lumbar area. Dr. Reddick referred the plaintiff for a L5-S1 facet injection, refilled his Lortab, and increased his dose of Kadian (Tr. 589-92).

On April 11, 2013, Dr. Bernardo evaluated the plaintiff for follow-up of joint pain. Dr. Bernardo noted that the plaintiff was being followed by the pain clinic. The plaintiff requested a rheumatology referral for his Sjogren's syndrome. The plaintiff complained of migratory joint pain, joint stiffness, morning stiffness, fatigue, and muscle weakness. He reported back stiffness with lower extremity numbness, tingling, and weakness. The plaintiff also reported constant moderate bilateral foot pain. He indicated that he felt like his brain was "cloudy, at times freezes up." He stated that this changes even though he is on the same medicine regiment daily, and he wondered if this could be

20

due to his Sjogren's syndrome or fibromyalgia. Dr. Bernardo refilled the plaintiff's medications and referred him back to Dr. Goeckeritz for an evaluation of Sjogren's syndrome (Tr. 650-54).

A Physical Residual Functional Capacity Assessment was completed by Adrian Corlette, M.D., a State agency contract physician, on April 23, 2013. He found the plaintiff capable of lifting and carrying 50 pounds occasionally and 25 pounds frequently, standing/walking about six hours in an eight hour workday, and sitting about six hours in an eight hour workday. Dr. Corlette indicated that the plaintiff could occasionally climb ladders, ropes, or scaffolds; had unlimited ability to balance; and, could frequently perform all other postural activities. Dr. Corlette indicated that the plaintiff was limited to occasional overhead reaching with his left upper extremity. Dr. Corlette also indicated that the plaintiff needed to avoid concentrated exposure to hazards (Tr. 152-55).

On May 7, 2013, Dr. Reddick evaluated the plaintiff. The plaintiff reported that his medications were not helping like they used to. He reported constant burning in his feet and recent hernia surgery. Dr. Reddick noted that the plaintiff's preliminary drug screen included a finding of marijuana. Dr. Reddick explained that if test confirmation came back positive, she would no longer prescribe him narcotics (Tr. 793-96). On May 9, 2013, the plaintiff had lumbar facet injections (Tr. 708). On May 14, 2013, Dr. Chockalingam reevaluated the plaintiff for severe abdominal pain. Dr. Chockalingam noted that the plaintiff had GERD, bloating, and constipation. Dr. Chockalingam reviewed and adjusted his medications (Tr. 692-94).

On May 24, 2013, Dr. Bernardo referred the plaintiff to rheumatologist Amir Agha, M.D., of Foothills Rheumatology at the plaintiff's request for Sjogren's syndrome (Tr. 654). The plaintiff reported muscle pain and fatigue, but no muscle weakness. He reported being tired all day long, having no energy, sleep problems, and a history of tinnitus. The plaintiff also reported abdominal pain associated with constipation and diarrhea in addition

21

to headaches (Tr. 712-713). Dr. Agha's impression was the plaintiff had fibromyalgia and Sjogren's syndrome, but the plaintiff's lab work was negative (Tr. 713). Dr. Agha prescribed medication and treated him on two more occasions for complaints of generalized muscle pain (Tr. 710-13).

On June 4, 2013, Dr. Reddick evaluated the plaintiff, who reported that his medications were just 'knocking the pain off" but only lasting a couple of hours before he needed to apply ice. He reported that his injections helped "a lot." Dr. Reddick noted that the plaintiff's drug screen indicated that he may not have been taking his medications as prescribed. She noted that the plaintiff did not have a history of alcohol abuse but did have a strong odor that was suggestive of this. Dr. Reddick refilled the plaintiff's Lortab and Kadian (Tr. 788-91).

On June 21, 2013, Dr. Agha evaluated the plaintiff for complaints of being sore and achy. Dr. Agha noted that the plaintiff had arthralgia and myalgia, morning stiffness, joint swelling, and night pain. The plaintiff also had tinnitus. Dr. Agha diagnosed sicca syndrome and fibromyalgia. He adjusted the plaintiff medications (Tr. 710). On June 25, 2013, the plaintiff had a lumbar facet joint injection (Tr. 707).

On July 2, 2013, Dr. Reddick evaluated the plaintiff for chronic pain. The plaintiff reported that his medications were working "ok," but he would like an increase in his morphine. Dr. Reddick reviewed the plaintiff's medications and refilled his Lortab and Kadian (Tr. 783-86). On July 8, 2013, Dr. Noojin evaluated the plaintiff for continued left shoulder pain. Dr. Noojin noted that the plaintiff was being treated through pain management. The plaintiff had reduced range of motion in his left shoulder compared to the right and 4+/5 suprapinatus strength on the left compared to the right. Dr. Noojin diagnosed greater tuberosity fracture with residual pain. Dr. Noojin discussed treatment options with the plaintiff and indicated that he was leaning towards proceeding with an arthroscopic evaluation with debridement and decompression, Mumford, and evaluation of

22

rotator cuff. Dr. Noojin indicated that he also planned to do a distal clavicle excision at that time. Dr. Noojin stated, "With this procedure there is a slight risk of spur reformation, residual shoulder pain and/or instability of the AC joint" (Tr. 313).

On July 17, 2013, Dr. Bernardo completed a Physical Capacity Evaluation in which he indicated that the plaintiff could sit for one hour at a time, stand for 15 minutes at a time, and walk for ten minutes at a time (but did not indicate how many hours total the plaintiff could sit, stand, and walk); he could occasionally lift and carry up to 20 pounds; he could not push or pull or operate foot/leg controls with either his upper or lower extremities; he could not handle or reach with his left arm; he could never climb stairs or ladders; could never be exposed to unprotected heights, moving machinery, vibration, or extreme temperatures; and he could occasionally reach above shoulder level and be exposed to noise and dust, fumes, and gases (Tr. 700-03).

On July 19, 2013, Dr. Agha evaluated the plaintiff for continued pain complaints. Dr. Agha indicated that the plaintiff had arthralgia and myalgia, morning stiffness, joint swelling, night pain, and sicca symptoms. Dr. Agha adjusted the plaintiff's medications and ordered an eye examination (Tr. 711). On July 22, 2013, Dr. Bernardo evaluated the plaintiff for follow-up of joint pain, joint stiffness, morning stiffness, and muscle weakness. The plaintiff complained of swelling in his right hand, lower back pain, and bilateral knee pain. The plaintiff also complained that his brain was "cloudy" at times. Dr. Bernardo prescribed medications for chronic sinusitis, folliculitis, IBS, Sjogren's syndrome, and vertigo (Tr. 695-99).

On July 23, 2013, Dr. Bernardo wrote a letter "To Whom It May Concern" opining that the plaintiff could not perform any kind of manual labor and it was "very difficult if not impossible" for him to sit still and concentrate, noting his diagnoses of back pain, Sjogren's syndrome, plantar fasciitis, anxiety, and IBS. Further, Dr. Bernardo indicated that

the large amount of narcotic pain relievers the plaintiff was taking "would make him lethargic, drowsy, and confused" and possibly "comatose" (Tr. 704-705).

On July 24, 2013, the plaintiff was seen at the Newberry Memorial Hospital emergency room reporting ankle pain after a fall (Tr. 772-73). The plaintiff had mild tenderness to palpation of his right ankle, but he had intact motor function, sensation, and range of motion in his lower extremities (Tr. 773). Further, the plaintiff reported no tenderness in his lumbar spine, and range of motion in his spine was normal. The plaintiff was instructed to ice his ankle and prescribed narcotic pain relievers (Tr. 773). On July 29, 2013, the plaintiff had a lumbar facet joint injection (Tr. 706).

On August 6, 2013, Brant Turner, a physician's assistant at Pain Management Associates, evaluated the plaintiff for back and leg pain. The plaintiff reported that his medications were not working and he was having trouble sleeping. Mr. Turner noted that the plaintiff had recently received pain medication from the emergency room and did not report this to their office when he called five days after his emergency room visit. Mr. Turner indicated that this was a violation of the plaintiff's narcotic agreement and that he would be discharged from their practice. He provided the plaintiff with a 30 day supply of Kadian and Lortab (Tr. 779-81). Dr. Reddick and the Pain Management Associates discharged the plaintiff from their care because he had been obtaining narcotic pain relievers from other health care providers without disclosing this fact (Tr. 778-80).

On August 12, 2013, Dr. Noojin provided a statement indicating that when the plaintiff was seen on July 8, 2013, it was recommended that he have surgery for arthroscopic evaluation with debridement and decompression, Mumford, and evaluation of rotator cuff. Dr. Noojin indicated that this would be scheduled as an outpatient, and he was ready to proceed with scheduling at that time (Tr. 810).

24

On August 23, 2013, Dr. Agha evaluated the plaintiff for complaints of pain "all over." Dr. Agha noted arthralgia and myalgia, low back pain, sicca symptoms, morning stiffness, and sleep problems. Dr. Agha continued the plaintiff's medications (Tr. 822).

***Administrative Hearing***

The plaintiff reported at the hearing and on a function report that he helped care for his teenage daughter, drove her to school, performed his personal care needs, prepared meals daily, cleaned, washed laundry, performed small household repairs, cut the grass, shopped in stores for groceries, attended church and his daughter's school activities, and socialized with others (Tr. 58, 233-37). The plaintiff also read books, completed puzzles, watched television, and helped his daughter with her homework. He was able to pay bills and manage a checking/savings account, and he indicated that he could pay attention for an hour or so at a time and followed verbal instructions "pretty good for the most part" (Tr. 60, 236-38).

The plaintiff testified at the hearing that he had not worked part-time since 2010 and reported that his posted earnings in 2011 were from the sale of painting equipment (Tr. 55, 84-85). However, on the plaintiff's tax return, he reported spending in excess of $3,000 in business supplies (and did not report the sale of any equipment) (Tr. 25, 199-208). The plaintiff also reported working as a painter to treating sources during the relevant time period (Tr. 506, 620).

During the hearing, the ALJ asked the vocational expert to consider an individual of the plaintiff's age, education, and with his work experience, who was able to perform a range of light work that involved only lifting/carrying ten pounds frequently and 20 pounds occasionally; could stand/walk for approximately six hours in an eight hour workday; allowed for the option to alternate between sitting and standing at will (such that would not cause him to be off task); no overhead reaching, lifting, or carrying with his left, non-dominant upper extremity; occasional stair/ramp climbing, stooping, and crouching; no

25

kneeling or climbing ladders/scaffolds/ropes; only simple, routine unskilled tasks with no production quotas.  The vocational expert testified that such an individual could perform work as an office helper, ticket seller, charge account clerk, and food and beverage order clerk (Tr. 92-94).

## ANALYSIS

The plaintiff was 41 years old on the alleged disability onset date and 43 years old on the date of the ALJ's decision.  He has limited education and past relevant work as a painter (Tr. 224).  The plaintiff argues that the ALJ erred by (1)  failing to give proper weight to Dr. Bernardo's opinions and (2)  failing to evaluate all of his impairments in the residual functional capacity ("RFC") assessment (pl. brief 22-34).

### *Treating Physician*

The plaintiff first argues that the ALJ improperly disregarded Dr. Bernardo's opinions (pl. brief 22-30).  The regulations require that all medical opinions in a case be considered, 20 C.F.R. §§ 404.1527(b), 416.927(b), and, unless a treating source's opinion is given controlling weight, weighed according to the following non-exclusive list: (1) the examining relationship; (2) the length of the treatment relationship and the frequency of the examinations; (3) the nature and extent of the treatment relationship; (4) the evidence with which the physician supports his opinion; (5)  the consistency of the opinion; and (6) whether the physician is a specialist in the area in which he is rendering an opinion. *Id.* §§ 404.1527(c)(1)-(5), 416.927(c)(1)-(5). *See also Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005).  However, statements that a patient is "disabled" or "unable to work" or similar assertions are not medical opinions.  These are administrative findings reserved for the Commissioner's determination. SSR 96-5p, 1996 WL 374183, at *5.

The opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with  the  other  substantial  evidence  in  the  case. *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001).  Social

26

Security Ruling ("SSR") 96-2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion. 1996 WL 374188, at *5. As stated in SSR 96-2p:

> [A] finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. §§ 404.1527 and 416.927. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

*Id.* at *4.

On October 31, 2012, Dr. Bernardo completed a questionnaire concerning the plaintiff's mental impairment. Dr. Bernardo indicated that the plaintiff was diagnosed with an anxiety disorder for which he was prescribed Alprazolam that helped his condition. Dr. Bernardo further indicated that he did not recommend that the plaintiff receive psychiatric treatment for his condition. The plaintiff was oriented to time, place, person, and situation; he had intact thought processes and content; and both his ability to concentrate/maintain attention and memory were adequate. Accordingly, Dr. Bernardo opined that the plaintiff's mental condition would impose only "slight" work-related limitations (Tr. 501). On February 11, 2013, Dr. Bernardo wrote a letter "To Whom It May Concern" opining that he felt "[the plaintiff] is not employable at this time" referencing the plaintiff's plantar fasciitis, Sjogren's syndrome, esophageal reflux and IBS, anxiety, and low back pain (Tr. 663). On July 17, 2013, Dr. Bernardo completed a Physical Capacity Evaluation in which he indicated that the plaintiff could sit for one hour at a time, stand for 15 minutes at a time, and walk for ten minutes at a time; he could occasionally lift and carry up to 20 pounds; he could not push or pull or operate foot/leg controls with either his upper or lower extremities; he could not

handle or reach with his left arm; he could never climb stairs or ladders; could never be exposed to unprotected heights, moving machinery, vibration, or extreme temperatures; and he could occasionally reach above shoulder level and be exposed to noise, dust, fumes, and gases (Tr. 700-03).  Lastly, on July 23, 2013, Dr. Bernardo wrote a letter opining that the plaintiff could not perform any kind of manual labor and it was "very difficult if not impossible" for him to sit still and concentrate, noting his diagnoses of back pain, Sjogren's syndrome, plantar fasciitis, anxiety, and IBS.  Further, Dr. Bernardo indicated that the large amount of narcotic pain relievers the plaintiff was taking "would make him lethargic, drowsy, and confused" (Tr. 704-705).

The ALJ gave Dr. Bernardo's conclusions "little weight," finding that they were not supported by his own clinical findings and were inconsistent with substantial evidence of record (Tr. 23-27).    The ALJ explained that Dr. Bernardo's restrictive limitations concerning the plaintiff's ability to stand/walk, to operate foot and hand controls, and to use arms for handling and reaching were not supported by his physical examination findings that documented no significant functional limitations (Tr. 24-27).  As the ALJ specifically referenced, Dr. Bernardo repeatedly found that the plaintiff had full motor strength and muscle tone, intact sensation, and normal range of motion in his upper and lower extremities (Tr. 24, 27; *see* Tr. 380, 384, 387, 412, 661).  The ALJ further noted that Dr. Bernardo generally found that the plaintiff had a normal gait and station (Tr. 24, 27; *see* Tr. 380, 384, 387, 412, 661).  The ALJ stated that the "only abnormal findings made on a repeated basis" by Dr. Bernardo was tenderness in the plaintiff's back, "but even this finding was inconsistent as it was not always noted" (Tr. 24; *see* Tr. 380, 387, 412, 589-92, 619, 773, 801-803).  Furthermore, the ALJ found that Dr. Bernardo's indication that the plaintiff had significant difficulty in maintaining focus and concentration was inconsistent with his mental status findings (Tr. 27). As the ALJ discussed, Dr. Bernardo indicated on a prior questionnaire that the plaintiff had "adequate" ability to maintain attention and concentration

28

and "adequate" memory (Tr. 22, 27; *see* Tr. 501).  Further, Dr. Bernardo's mental status examinations were generally unremarkable, with Dr. Bernardo noting that the plaintiff exhibited normal mental status, was alert and oriented, and had intact recent and remote memories (Tr. 21-22; *see* Tr. 387-88, 393, 404, 412, 417, 421, 605).

The ALJ also found that Dr. Bernardo's opinions were inconsistent with other substantial evidence of record (Tr. 27).  The ALJ noted findings by  Dr. Noojin, who treated the plaintiff for his left shoulder fracture, that the plaintiff's fracture was healing satisfactorily, he had only mild deficits in his range of motion, and he had full (five out of five) to near full (four plus out of five) motor strength in his upper extremities (Tr. 20-21; *see* Tr. 505, 551, 553, 556).  Moreover, Dr. Reddick, the plaintiff's pain management specialist, documented no disabling functional limitations.  Specifically, the ALJ noted Dr. Reddick's findings that the plaintiff appeared to be in no acute distress and exhibited normal mobility and range of motion (Tr. 24-25; *see* Tr. 590-91, 594-95, 619, 629-30, 784-85, 789-90, 802-03).  Further, the plaintiff had normal muscle tone and full muscle strength in his lower extremities (Tr. 24-25; *see* Tr. 590-91, 594-95, 619, 629-30, 784-85, 789-90, 802-03).

The plaintiff argues that the ALJ erred in his statement that "[Dr. Bernardo's] opinion that the claimant would have significant problems concentrating and would become comatose is contradicted by his finding that the claimant had adequate concentration" (pl. brief 28 (citing Tr. 27)).  The plaintiff contends that the ALJ misinterpreted Dr. Bernardo's statement because Dr. Bernardo never indicated that the plaintiff's medications *made* him comatose (*id.*).  Dr. Bernardo's actual statement was that "[t]his amount of medicine for someone who wasn't on medicine previously could possibly make them 'comatose,'" which the plaintiff states was simply to emphasize the amount of strong pain medication the plaintiff required (*id.* (quoting Tr. 705)).  The ALJ specifically noted that Dr. Bernardo opined "that the claimant's medications *could possibly cause* the claimant to become 'comatose'" (Tr. 27 (emphasis added)).  The undersigned sees no error in the ALJ's finding as Dr.

29

Bernardo's opinion in general was contradicted by his previous finding that the plaintiff had adequate concentration.

The plaintiff further contends that the ALJ misinterpreted Dr. Bernardo's statement that the plaintiff had adequate concentration because it was made as part of a questionnaire as to the plaintiff's mental condition, which "cannot be considered as contradictory to Dr. Bernardo's separate opinions about [the plaintiff's] physical impairments and effect of the pain resulting from those physical impairments" (pl. brief 29 (citing Tr. 501)). This argument is unavailing. In response to a request for comment on the plaintiff's mental status, Dr. Bernardo stated that the plaintiff was oriented to time, person, place, and situation and had intact thought process, appropriate thought content, adequate attention/concentration, and adequate memory (Tr. 501). It was reasonable for the ALJ to presume that, if the plaintiff's concentration was inadequate – regardless of the reason for the deficiency, Dr. Bernardo would have indicated such on the form. The plaintiff's allegations of error here are meritless.

The plaintiff next argues that the ALJ erred by affording great weight to State agency physician Dr. Corlette's opinion because it was based on a "significantly incomplete or partial" record (pl. brief 29-30). Specifically, Dr. Corlette's RFC assessment (Tr. 152-55), dated April 23, 2013, was made before Dr. Bernardo's RFC assessment (see Tr. 700-703), dated July 17, 2013 (pl. brief 29-30).

The ALJ was required to consider the state agency physician assessments as opinion evidence. See 20 C.F.R. §§ 404.1527(e)(2)(i), 416.927(e)(2)(i) ("State agency medical and psychological consultants . . . are highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation. Therefore, administrative law judges must consider findings and other opinions of State agency medical and psychological consultants . . . as opinion evidence, except for the ultimate determination about whether you are disabled."). See SSR 96-6p, 1996 WL

374180, at *3 ("In appropriate circumstances, opinions from State agency medical . . . consultants . . . may be entitled to greater weight than the opinions of treating or examining sources."); *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir.1984) ("[T]he testimony of a non-examining, non-treating physician should be discounted and is not substantial evidence when totally contradicted by other evidence in the record. . . . [W]e have also ruled that the testimony of a non-examining physician can be relied upon when it is consistent with the record.") (citations omitted).   Dr. Corlette reviewed the record approximately three months before the administrative hearing and, accordingly, had access to the majority of the plaintiff's treatment records, from November 2011 to April 2013 (*see* Tr. 142-55). Furthermore, as noted by the Commissioner, although the plaintiff received some additional treatment after the opinion was offered, the plaintiff's treating physicians' clinical findings remained unchanged (Tr. 713, 783-85, 788-90, 801-03).   Furthermore, in weighing the opinion, the ALJ reviewed the record in its entirety (Tr. 17-29).   An ALJ may rely on a medical source opinion that did not have access to the entire medical record, so long as the ALJ considered the entire evidentiary record and substantial evidence supports the ALJ's decision. *Thacker v. Astrue*, No. 11-246, 2011 WL 7154218, at *6 (W.D.N.C. Nov. 28, 2011), *adopted by* 2012 WL 380052 (W.D.N.C. Feb. 6, 2012).   Furthermore, based upon her review of the evidence, the ALJ afforded the plaintiff more restrictive limitations than those assessed by Dr. Corlette (Tr. 23; *see* Tr. 152-55).   The undersigned finds no error in the ALJ's decision to give great weight to Dr. Corlette's opinion.

***Residual Functional Capacity***

The plaintiff next argues that the ALJ erred by failing to evaluate all of his impairments in the RFC assessment.   He further contends that the RFC assessment is not based upon substantial evidence (pl. brief 31-34).   Social Security Ruling ("SSR") 96-8p provides in pertinent part:

> The RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraph (b), (c), and (d) of 20 C.F.R. §§ 404.1545 and 416.945. Only after that may RFC be expressed in terms of the exertional level of work, sedentary, light, medium, heavy and very heavy.

SSR 96-8p, 1996 WL 374184, at *1.  The ruling further provides:

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations).  In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record.  The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

*Id.* at *7 (footnote omitted).  Further, "[t]he RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." *Id.*  Moreover, "[t]he RFC assessment must always consider and address medical source opinions.  If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted."  *Id.*

Here, the ALJ limited the plaintiff to a range of light work with a sit-stand option, several postural limitations such as no overhead reaching/lifting/carry with his left, nondominant upper extremity, and only simple, unskilled work with no production quotas (Tr. 23).  The plaintiff specifically argues that the ALJ failed to consider his plantar fasciitis (pl. brief 32-33).  Although the ALJ found that the plaintiff's plantar fasciitis was not a severe impairment (Tr. 20), the undersigned agrees with the Commissioner that the ALJ considered all the functional limitations resulting from the plaintiff's impairments in

assessing his RFC (Tr. 23-27).  As the ALJ discussed, the medical evidence did not indicate any significant functional limitations with regard to the plaintiff's lower extremities. Although the plaintiff reported tenderness in his feet, his treating physicians documented that he had normal muscle tone, motor strength, range of motion, and sensation in his lower extremities, and he generally exhibited a normal gait (Tr. 20-21, 23-27; *see* Tr. 380, 384, 387, 412, 510, 512, 519, 590-91, 594-95, 619, 629-30, 661, 773, 784-85, 789-90, 802-03). The plaintiff's EMG also showed no significant evidence of neuropathy or lumbar radiculopathy affecting his lower extremities (Tr. 20; *see* Tr. 516-17).

The plaintiff further argues that the ALJ failed to consider his left shoulder fracture (pl. brief 33). However, the evidence showed that the plaintiff's fracture was healing, and he had no disabling limitations. Specifically, he had normal to only mild deficits in his range of motion, and he had full (five out of five) to near full (four plus out of five) motor strength in his upper extremities (Tr. 20-21, 23-27; *see* Tr. 505-06, 551, 553, 556). Moreover, the ALJ included specific restrictions in the RFC assessment in the use of the plaintiff's left upper extremity, including no overhead lifting, no overhead reaching, and no overhead carrying (Tr. 23).  The plaintiff has failed to show that the record supports greater functional limitations than those already accounted for by the ALJ in the RFC assessment.

The plaintiff further contends that the ALJ failed to consider his Sjogren's syndrome, anxiety, and fibromyalgia (pl. brief 33).  With regard to the plaintiff's anxiety, the ALJ's restriction to simple, unskilled work with no production quotas accounted for the plaintiff's credibly supported mental limitations. The ALJ noted that Dr. Bernardo did not note any significantly abnormal objective findings regarding the plaintiff's mental status, and there was no record that the plaintiff received any treatment from a mental health specialist (Tr. 21; *see* Tr. 387-88, 393, 404, 412, 417,421, 501, 605). The ALJ also considered the plaintiff's diagnosis with Sjogren's syndrome, which is "a disorder of the immune system

identified by its two most common symptoms – dry eyes and a dry mouth." Sjogren's syndrome, http://www.mayoclinic.org/diseases-conditions/sjogrens-syndrome/basics/definition/con-20020275 (last visited May 29, 2015). The ALJ noted that lab work had been negative, and the plaintiff had himself reported that the syndrome was controlled (Tr. 20 (citing Tr. 712-13 (noting that syndrome was "relatively under control with some dryness in the mouth")). The ALJ also considered the plaintiff's diagnosis of fibromyalgia, noting that the record did not contain the findings specified in Social Security Ruling 12-2p that are necessary to support such a diagnosis. *See* 2012 WL 3104869, at *2-3. The plaintiff has failed to show that the record supports greater functional limitations than those already account for by the ALJ in the RFC assessment.

The plaintiff also argues that the combination of all his impairments caused him to continuously need strong, narcotic pain medication, which further limited his RFC (pl. brief 33-34). However, as found by the ALJ, Dr. Bernardo generally noted that the plaintiff had a normal mental status, was alert and oriented, had adequate concentration, and intact recent and remote memory (Tr. 21, 27; *see* Tr. 387-88, 393, 404, 412, 417,421, 501, 605).

In addition, as argued by the Commissioner, the non-medical evidence also supported the ALJ's RFC assessment. The ALJ explained that her observation of the plaintiff at the administrative hearing showed no indication that he was in pain or distress, and he was alert, coherent, exhibited good memory, and gave intelligent responses (Tr. 24, 26). Further, the ALJ found that the plaintiff's reported daily activities did not support disabling limitations. For example, he performed some work as a painter during the relevant time period (Tr. 25; *see* Tr. 199-208, 506, 620). He also prepared meals daily, cleaned, washed laundry, performed small household repairs, cut the grass, shopped, and attended church and his daughter's school activities (Tr. 21; *see* Tr. 58, 233-38, 506). Finally, the ALJ explained that the plaintiff's inconsistent statements and drug seeking behaviors

34

(documented by several physicians throughout the record) undercut his subjective reports to treating physicians and undermined his overall credibility (Tr. 25-26).

Based upon the foregoing, the undersigned finds that the ALJ's RFC assessment is supported by substantial evidence and is without legal error.

### CONCLUSION AND RECOMMENDATION

This court finds that the Commissioner's decision is based upon substantial evidence and free of legal error.  Now, therefore, based upon the foregoing,

IT IS RECOMMENDED that the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

s /Kevin F. McDonald
United States Magistrate Judge

June 2, 2015
Greenville, South Carolina

35